**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **AMOS O. ADETULA,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 13-CV-0069-JED-PJC** |
| | ) | |
| **MAURICE WARRIOR, Interim** | ) | |
| **Warden,[1] Oklahoma State Penitentiary,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## OPINION AND ORDER

Before the Court is the 28 U.S.C. § 2254 petition for writ of habeas corpus (Doc. 1) filed by

Petitioner, Amos O. Adetula, a state prisoner appearing *pro se*.  Petitioner also filed a brief in

support of the petition (Doc. 2).  Respondent filed a response (Doc. 6) and provided the state court

records (Doc. 7) necessary for adjudication of Petitioner's claims.  Petitioner did not file a reply.

For the reasons discussed below, the petition for writ of habeas corpus shall be denied.

## BACKGROUND

Petitioner challenges his convictions of Second Degree Murder and Assault and Battery with

a Deadly Weapon entered in Tulsa County District Court, Case No. CF-2009-113.  Doc. 6-3 at 1.

The convictions resulted from the death of Norris Walton and injury of Joseph Doyle sustained in

a drive-by shooting.  Doc. 7-4, Tr. Vol. III at 184; Doc. 7-3, Tr. Vol. II at  188.  The record

demonstrates that, on January 7, 2009, Petitioner, his girlfriend Erica Gordon, his friend Derek

Thomas, and Thomas' girlfriend Aisha Walker left Walker's apartment and drove to a liquor store

---

[1]On October 28, 2015, Maurice Warrior became Interim Warden at the Oklahoma State
Penitentiary.  Pursuant to Fed. R. Civ. P. 25(d), Maurice Warrior is hereby substituted as party
respondent in place of Anita Trammell.  The Clerk shall note the substitution on the record.

called "The Glass House," located in Tulsa, Oklahoma.  Doc. 7-3, Tr. Vol. II at 208, 211, 220.

Thomas had borrowed Walker's brother's Ford Explorer and was driving with Walker sitting beside

him, Gordon sitting directly behind him, and Petitioner sitting in the backseat on the passenger side.

*Id.* at 209, 219.

As they approached the Glass House, Petitioner saw Doyle, a man he believed had been

involved in trying to rob him and Thomas a month prior.  *Id.* at 220; Doc. 7-5, Tr. Vol. IV at 16-17.

Walker testified that Petitioner said, "[t]here's that dude we got into it with."  Doc. 7-3, Tr. Vol. II

at 220.  Petitioner testified that he wanted to get out of the car, but Thomas would not let him and

told him to "hang on."  Doc. 7-4, Tr. Vol. III at 7; Doc. 7-5, Tr. Vol. IV at 18.  Thomas then drove

out of the parking lot of the Glass House.[2]  Doc. 7-3, Tr. Vol. II at 221.  When the prosecutor asked

if there was "any conversation about where you were going when you left the Glass House," Walker

stated, "[n]o, we just made the block."  *Id.* at 222.

By the time the vehicle came back around the block toward the Glass House, Doyle had

crossed the street and was walking in front of a gas station that was situated on the driver's side of

the vehicle.  *Id.* at 186-87.  Doyle testified that he heard gun shots coming from the direction of the

vehicle driven by Thomas, and then a bullet struck him in the leg.  *Id.* at 188.  Additionally, a bullet

struck and killed Walton, a bystander.  Doc. 7-4, Tr. Vol. III at 184.

After the shooting, Petitioner, Thomas, Walker, and Gordon left the city.  *Id.* at 25.  Walker,

Gordon, and Petitioner eventually returned to Tulsa, while Thomas stayed in California where he

---

[2] Walker's testimony at trial was ambiguous as to whether Petitioner, after pointing Doyle out to Thomas, instructed Thomas to drive around the block.  Doc. 7-3, Tr. Vol. II at 220-21 ("Q: And did [Thomas] have any response? A: He was like, 'Where'? Not really, he didn't. Q: And did [Petitioner] say anything after that? A: Make the block. Q: I'm sorry, did [Petitioner] say anything after [Thomas] says 'where'? A: No, not as I remember.  No.").

was later arrested.  *Id.* at 27-28, 92.  While in custody in California, Thomas made a spontaneous admission to a member of the Sacramento Sheriff's Department related to the incident on January 7, 2009.  *Id.* at 94.  After being advised of his *Miranda* rights,[3] Thomas stated that he, and not Petitioner, had been the shooter that day.  Doc. 7-9, O.R. Vol. II at 221-22.  In his confession, Thomas accurately recounted most of the facts of the incident, although there were some discrepancies.  *See id.* at 225-49.

Petitioner and Thomas were both charged in Tulsa County District Court, Case No. CF-2009-113, with First Degree Murder for the death of Walton and Assault and Battery with a Deadly Weapon for the shooting of Doyle.  Doc. 6-1 at 1; Doc. 6-3 at 1; *Thomas v. State*, Case No. F-2012-4 at 1 (Okla. Crim. App. 2013) (unpublished) (*available at* www.oscn.net).  The trial court granted a motion to sever defendants' trials, Doc. 6-1 at 1,[4] and Steven Hightower and Shannon McMurray represented Petitioner at his trial.  Doc. 6-3 at 8.

At trial, the witnesses' testimonies differed as to whether Petitioner or Thomas was the shooter.  Walker testified that as the vehicle passed the gas station she "heard the shooting, looked back, and [saw] the gun in [Petitioner's] hand."  Doc. 7-3, Tr. Vol. II at 223.  When asked specifically what she saw, Walker testified that she saw Petitioner's "arm out the window with the gun shooting," *id.*, and that Petitioner fired six times.  *Id.* at 225.  Gordon testified that, as they drove in front of the gas station, Petitioner "told me to watch out and he pulled my head to his arm."  Doc.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] A jury convicted Thomas of Second Degree Murder and Assault and Battery with a Deadly Weapon and recommended a sentence of thirty (30) years and five (5) years imprisonment on the convictions, respectively.  The trial judge sentenced Thomas in accordance with the jury's recommendation and ordered the sentences to be served consecutively.  *Thomas*, Case No. F-2012-4 at 1; *see* www.oscn.net.

7-4, Tr. Vol. III at 9.   According to Gordon, she did not see who fired the shots, but she saw Petitioner "pulling a gun out of . . . the right side of the car" before the shots were fired.  *Id.*

Walker's testimony was countered by defense witness Helen Goudeaux.  Goudeaux was sitting in her car at a red light when the vehicle driven by Thomas pulled up beside and slightly in front of her vehicle.  Doc. 7-5, Tr. Vol. IV at 31, 33.  In contrast to Walker's testimony, Goudeaux testified that the driver of the vehicle "was yelling at somebody over at the service station" and "started shooting over towards the service station."  *Id.* at 32.   Goudeaux also testified that Petitioner's skin tone was "much darker than the one that shot out of the window.  They weren't the same color."  *Id.* at 36.

At trial, Petitioner testified in his own defense.  Petitioner admitted that he had a gun and pulled it out, but denied firing the gun.  *Id.* at 12-13.  Instead, Petitioner stated that Thomas fired the shots out of the front driver's side window.  *Id.* at 13, 20.  Petitioner testified that when Thomas drove out of the parking lot of the Glass House he believed "we [were] just gonna circle the block and come back and, you know, show 'em, like, hey, we got guns, you know, but I never intended to shoot anybody you know . . . I had no idea [Thomas] was gonna shoot anybody."  *Id.* at 13.

At the beginning of Petitioner's trial, the prosecution filed a motion in limine seeking to prevent Petitioner from introducing Thomas' confession to the Sacramento deputy sheriff. Doc. 7-2, Tr. Vol. I at 7.  Defense counsel argued that the statement should come in under the hearsay exception for a statement against interest where the declarant is unavailable.[5]  Doc. 7-3, Tr. Vol. II

---

[5]During the hearing, Thomas' counsel stated that Thomas intended to invoke his Fifth Amendment right against self-incrimination should he be called to testify.  Doc. 7-2, Tr. Vol. I at 11.

at 172.  The trial court granted the motion in limine, finding that "the statements offered by Defendant Dereck Thomas are hearsay and are not admissible."  Doc. 7-4, Tr. Vol. III at 144.

The jury found Petitioner guilty of both the lesser included offense of Second Degree Murder and Assault and Battery with a Deadly Weapon.  Doc. 6-3 at 1.  The jury recommended sentences of twenty-five (25) years and ten (10) years imprisonment on the convictions, respectively.  *Id.*  The trial judge sentenced Petitioner in accordance with the jury's recommendations.  *Id*.

Petitioner perfected a direct appeal to the Oklahoma Court of Criminal Appeals (OCCA). *Id*.  On appeal, attorney Traci Quick represented Petitioner and raised the following propositions of error:

Proposition I:       The trial court committed reversible error by refusing to allow the defense to present the codefendant's confession to the crimes at bar.  The Court's actions violated appellant's rights under the Sixth and Fourteenth Amendments of the United States Constitution and Article II, §§ 7 and 20 of the Oklahoma Constitution.

Proposition II:      The State committed reversible error by improperly commenting on Appellant's right to remain silent in violation of Appellant's rights under the Fifth Amendment to the United States Constitution and Article 2, § 20 of the Oklahoma Constitution.

Proposition III:     The prosecutor's misstatements of the facts and law deprived Appellant of a fair trial in violation of the Fourteenth Amendment of the United States Constitution and Article II, §§ 7 and 20 of the Oklahoma Constitution.

Proposition IV:      Mr. Adetula was denied effective assistance of counsel in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 9 and 20 of the Oklahoma Constitution.

Proposition V:       The accumulation of errors deprived Appellant of a fair trial and the due process of law secured to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article 2, sections 7, 19, and 20 of the Oklahoma Constitution.

(Doc. 6-1).  In an unpublished summary opinion, filed April 26, 2012, in Case No. F-2011-205 (Doc.

6-3), the OCCA rejected each claim and affirmed the judgment and sentence of the state district

court.

On February 1, 2013, Petitioner filed his petition for writ of habeas corpus (Doc. 1).

Petitioner identifies four ground of error, as follows:

> Ground 1:    The trial court committed reversible error by refusing to allow the defense to present co-defendant's confession to the crimes at bar.

> Ground 2:    State improperly [commented] on Petitioner's right to remain silent in violation of his rights under [the] Fifth Amendment.

> Ground 3:    Prosecutor misstated facts and law during closing arguments.

> Ground 4:    Petitioner was denied Effective Assistance of Counsel in violation of his Sixth and Fourteenth Amendment rights.

(*Id.* at 5, 7, 8, 10).  In response to the petition, Respondent argues Petitioner is not entitled to habeas

corpus relief.  *See* Doc. 6 at 35.

## *ANALYSIS*

**A.    Exhaustion/Evidentiary Hearing**

As a preliminary matter, the Court must determine whether Petitioner meets the exhaustion

requirement of 28 U.S.C. § 2254(b), (c).  *See Rose v. Lundy*, 455 U.S. 509, 510 (1982).  Petitioner

presented his claims to the OCCA on direct appeal.  Therefore, the exhaustion requirement of 28

U.S.C. § 2254(b) is satisfied.

In addition, the Court finds that Petitioner is not entitled to an evidentiary hearing.  *See*

*Williams v. Taylor*, 529 U.S. 420 (2000).

**B.      Claims Adjudicated by the OCCA**

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the standard to be applied by federal courts reviewing constitutional claims brought by prisoners challenging state convictions.  Under the AEDPA, when a state court has adjudicated a claim, a petitioner may obtain federal habeas relief only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see Harrington v. Richter*, 562 U.S. 86, 102-03 (2011); *Williams v. Taylor*, 529 U.S. 362, 385-86 (2000); *Neill v. Gibson*, 278 F.3d 1044, 1050-51 (10th Cir. 2001).  "[C]learly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions."  *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted).

When a state court applies the correct federal law to deny relief, a federal habeas court may consider only whether the state court applied the federal law in an objectively reasonable manner. *See Bell v. Cone*, 535 U.S. 685, 699 (2002); *Hooper v. Mullin*, 314 F.3d 1162, 1169 (10th Cir. 2002). An unreasonable application by the state courts is "not merely wrong; even 'clear error' will not suffice."  *White*, 134 S. Ct. at 1702 (citation omitted).  The petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* (citation omitted) (internal quotation marks omitted); *see Metrish v. Lancaster*, 133 S. Ct. 1781, 1787 (2013).

Generally, a federal habeas court has no authority to review a state court's interpretation or application of its own state laws.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (emphasizing that

"it is not the province of a federal habeas court to reexamine state court determinations on state-law questions").  When conducting habeas review, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68 (citations omitted).

In this case, Petitioner presented his habeas claims to the OCCA on direct appeal. Because the OCCA addressed Grounds 1-4 on the merits, the § 2254(d) standard applies to this Court's analysis of those grounds.

**1. Exclusion of co-defendant's statement (Ground 1)**

As his first proposition of error, Petitioner alleges that "[t]he trial court committed reversible error by refusing to allow the defense to present co-defendant's confession to the crimes at bar." Doc. 1 at 10.  Before Petitioner's trial, the State filed a motion in limine to prevent the defense from introducing Thomas' confession into evidence.  Doc. 7-2, Tr. Vol. I at 7.  The defense sought to introduce the confession under the exceptions to the hearsay rule contained in OKLA. STAT. tit. 12, § 2804(B)(3) (2002) and OKLA. STAT. tit. 12, § 2804.1 (2002). *Id.* at 10.  After reflecting that he had "probably [] spent more time considering this overnight than any other case that I've had so far as a judge,"  the trial judge made a finding that Thomas was unavailable as a witness but that, based on "all the legal authority provided to [him] by the state and the defendant, coupled with the testimony of the witnesses under oath, and the exhibits offered by each party and considered," the statement was hearsay and not admissible.  Doc. 7-4, Tr. Vol. III at 143.

On appeal, the OCCA cited *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006), for the general proposition that "[t]he Constitution guarantees a criminal defendant a meaningful opportunity to present a complete defense," and held that:

[T]he trial court did not abuse its discretion in refusing to admit the co-defendant's confession. The Constitution guarantees a criminal defendant a meaningful opportunity to present a complete defense. This is particularly true where a defendant tries to introduce evidence that someone else committed the charged crime. Trial courts may exclude evidence that is (1) repetitive, (2) only marginally relevant, or (3) poses an "undue risk" of harassment, prejudice, or confusion of the issues. Adetula argues that the confession should have come under the hearsay exception in 12 O.S.2011, § 2804(B)(3). This exception to the hearsay rule applies where (a) the declarant is unavailable to testify, and (b) the statement tended to subject the declarant to criminal liability, and which a reasonable person in the declarant's position would not have made unless the declarant believed it to be true. Such a statement is not admissible under the statute unless "corroborating circumstances clearly indicate the trustworthiness of the statement." 12 O.S.2011, § 2804(B)(3). In making this determination, a trial court should consider any relevant evidence, not just the State's evidence.

The record supports the trial court's decision. First, the circumstances of the co-defendant's confession, made in California, are such that the co-defendant might have had reasons for exaggerating his role in the crime although he knew his statements were not true. Second, the co-defendant's description of the crime does not agree with the other evidence in the case. "A confession tends to be more trustworthy if it provides hitherto-unknown facts which are not only verifiable, but also consistent with known facts." *Pavatt* [*v. State*], 159 P.3d [272,] 289 [(Okla. Crim. App. 2007)]. The new facts in Thomas' confession are not consistent with the known facts. Finally, the co-defendant wrote several letters to the trial court recanting his confession. It is true that a defendant may present third-party perpetrator evidence "as long as there is some quantum of evidence, which is more than mere suspicion or innuendo, that connects the third party to the commission of the crime." *Summers* [*v. State*], 231 P.3d [125,] 147 [(Okla. Crim. App. 2010)]. Reversal in *Summers* was required in the context of that particular trial. This case differs significantly from *Summers*. Adetula sought to admit hearsay evidence of a confession which the co-defendant had since recanted. The confession itself differed significantly from eyewitness accounts of the crime and from Adetula's own admissions. Nothing in the record suggests that the State's witnesses were either habitual liars or had any motive to lie in this case. Adetula himself confirmed witness accounts that he was in the vehicle and had a gun, and that he expressed remorse after learning of one victim's death.

Doc. 6-3 at 2-4 (quotation marks and citations omitted). Respondent argues that Ground 1 is an issue of state law and that Petitioner's trial was not fundamentally unfair. Doc. 6 at 5, 7.

"Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights." *Smallwood v. Gibson*, 191 F.3d 1257, 1275 (10th Cir.

9

1999) (citation omitted).  For a writ of habeas corpus to be granted based on a state law evidentiary error, there must be a "determination that the state law violation rendered the trial fundamentally unfair." *James v. Gibson*, 211 F.3d 543, 555 (10th Cir. 2000) (citation omitted).  A trial is rendered fundamentally unfair if it would be "shocking to the universal sense of justice." *United States v. Russell*, 411 U.S. 423, 432 (1973) (internal quotation marks and citation omitted).

In *Crane v. Kentucky*, 476 U.S. 683 (1986) (citations omitted), the Supreme Court held that:

> Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense."  We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard.  That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence . . . when such evidence is central to the defendant's claim of innocence.

*Id.* at 690-91.  Under *Holmes*, the case cited by the OCCA, even though "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. . . . [t]his latitude, however, has limits." *Holmes*, 547 U.S. at 324 (internal quotation marks and citations omitted).  The Supreme Court held that the right to present a complete defense "is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Id.* (citations and quotation marks omitted).  A rule is arbitrary when it "exclude[s] important defense evidence but [] [does] not serve any legitimate interests." *Id.* at 325.  Rules of evidence designed to "focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues" are arbitrary if they "do[] not rationally serve [that] end." *Id.* at 330-31.

Rule 2804 of the Oklahoma Rules of Evidence provides an exception to the hearsay rule, as follows:

> [a] statement which [] at the time of its making . . . tended to subject the declarant to civil or criminal liability, . . . and which a reasonable person in the declarant's position would not have made unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

OKLA. STAT. tit. 12, § 2804(B)(3) (2002). To the extent the state trial court or the OCCA merely incorrectly applied state law to Petitioner's case, this Court lacks the authority to reexamine the OCCA's determination as federal habeas courts have no authority to review a state court's interpretation or application of its own state laws. *Estelle*, 502 U.S. at 67-68. While it is not within the purview of this Court to review strictly state law issues, where a state court adjudicates a federal constitutional claim, this Court may grant habeas corpus relief if the adjudication is contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. *See* 28 U.S.C. § 2254(d)(1), (2).

Although evidentiary issues, such as the admission of hearsay evidence through an exception found in the evidence code, are generally held to be strictly state law issues, the evidentiary issue in this case implicates Petitioner's constitutional right to present a complete defense. *Holmes*, 547 U.S. at 324. Thus, the question falls squarely within the purview of this Court. *See Janoushek v. Watkins*, 265 Fed. App'x 737, 742 & 742 n.3 (10th Cir. 2008) (unpublished)[6] (addressing whether the state court's exclusion of a witness deprived petitioner of his right to present a complete defense and stating that "[t]he district court concluded that this claim was one of pure state law. Although we agree that we may not consider whether the state court properly interpreted the state statute in

---

[6] This and other unpublished opinions are not precedential but are cited for their persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

excluding [petitioner's] witness, we may consider whether the state's exclusionary rule violated [petitioner's] federal constitutional rights." (citation omitted)).

While rules of evidence which "regulat[e] the admission of evidence . . . that someone else committed the crime with which [the defendant was] charged" – such as the rule at issue in this case – are "widely accepted," they can be of such a nature that they deprive the defendant of an opportunity to present a complete defense, and if the rule "serve[s] no legitimate purpose" or is "disproportionate to the [legitimate] ends" it seeks to promote it runs afoul of the Constitution. *Holmes*, 547 U.S. at 326-27. A rule of evidence serves a legitimate purpose and does not violate the Constitution when it "permit[s] trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 326.[7]

In determining whether the OCCA's ruling runs afoul of *Holmes*, the first question the Court must consider is the importance or centrality of the evidence the defense sought to introduce. *See Holmes*, 547 U.S. at 324, 325, 330 (expressing concern with rules that 'infring[e] upon a *weighty* interest of the accused' and "exclude[s] *important* defense evidence" and expressing approval of rules which "exclud[e] evidence that has only a *very weak* logical connection to the central issue."

---

[7] *See generally Pavatt v. State*, 159 P.3d 272, 288 (Okla. Crim. App. 2007) (affirming the trial court's exclusion of the written confession of a third party where the third party "was himself awaiting trial on an unrelated charge of first-degree capital murder," "just happened to be housed in the same 'pod' of the county jail as [petitioner]," "had allegedly attempted to 'confess' to other local murders besides this one," and where an individual connected with petitioner allegedly threatened a witness who was to testify against the third party in his criminal case), *writ of habeas corpus subsequently denied by Pavatt v. Trammell*, No. CIV-08-470-R, 2014 WL 1745019 (W.D. Okla. May 1, 2014).

(emphases added)).  Evidence of a third party perpetrator may be excluded if it has "only a very weak logical connection to the central issue" in the trial.  *Id*. at 330.

In this case, the prosecution argued to the jury that only one person in the vehicle fired at Doyle, striking him in the leg and killing a bystander.  *See* Doc. 7-3, Tr. Vol. II at 173-77 (prosecution's opening statement); Doc. 7-5, Tr. Vol IV at 81-88 (prosecution's closing argument). The prosecution presented evidence from Walker and Gordon that only one person in the vehicle fired a gun.  Doc. 7-3, Tr. Vol. II at 225; Doc. 7-4, Tr. Vol. III at 12.  The defense presented Petitioner's testimony and the testimony of a third party witness, Helen Goudeaux, that only one person in the vehicle fired a gun.  Doc. 7-5, Tr. Vol. IV at 12, 31-32.  No evidence was presented, and neither side argued, that more than one individual fired a gun during the incident.  *See id.* at 85 (The prosecution stated that "[t]here's been ample evidence that no one else in that vehicle had a gun.").

The prosecution argued that it was Petitioner who fired the gun, stating that "it is the state's contention, and always has been, that the defendant, Amos Adetula, is the person who shot the gun that day."  *Id.* at 85.  In response, the defense argued that it was Thomas who fired the gun.  *See id.* at 108.  Neither the prosecution nor the defense presented any physical evidence that could shed light on the identity of the shooter.  Only two of the witnesses who testified at Petitioner's trial claimed to have seen who fired the gun: prosecution witness Aisha Walker claimed that Petitioner fired the gun and defense witness Helen Goudeaux claimed that Thomas fired the gun.  *See* Doc. 7-3, Tr. Vol. II at 223; Doc. 7-5, Tr. Vol. IV at 32, 103.  The central question of the trial, as framed by the prosecution, was which individual in the car fired the gun.  In answering this question, the jury

would believe either Walker's account or Goudeaux's account.  In that context, the fact that Thomas had previously confessed to being the shooter was of paramount importance to Petitioner's defense.

Under *Holmes*, the Court must also determine whether the rule of evidence at issue serves a legitimate purpose or, if it does serve a legitimate purpose, whether it is disproportionate to that end.  *Holmes*, 547 U.S. at 326.  A rule of evidence serves a legitimate purpose if it excludes evidence where the "probative value [of the evidence] is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury" or where it "exclud[es] evidence that has only a very weak logical connection to the central issue." *Id.* at 326, 330.  The Tenth Circuit has upheld state court decisions to exclude evidence of third party perpetrators that amounted to "mere speculation and failed to reasonably connect [the third party] to the crime." *Krider v. Conover*, 497 F. App'x 818, 820 (10th Cir. 2012) (unpublished) (finding exclusion of evidence reasonable where the petitioner sought to introduce circumstantial evidence that victim's son-in-law had motive to commit the crime and opportunity to plant evidence to frame petitioner); *see United States v. Jordan*, 485 F.3d 1214, 1218-22 (10th Cir. 2007) (noting that "no witness placed [the alternative perpetrator] near [the victim] at the time of the stabbing" and the additional evidence "sheds little light on what happened in the prison yard the day [the victim] died"); *cf. United States v. Hernandez-Hernandez*, 519 F.3d 1236, 1241 (10th Cir. 2008) (upholding exclusion of evidence as speculative).

In its summary opinion, the OCCA listed several reasons why the trial court was justified in excluding Thomas' confession.  Doc. 6-3 at 3.  In light of the record presented to the OCCA, none of the reasons, considered separately or together, is sufficient to show that the trial court's decision was not disproportionate to any legitimate purpose it might have for excluding Thomas' confession.

14

First, the OCCA stated that "the circumstances of the co-defendant's confession, made in California, are such that the co-defendant might have had reasons for exaggerating his role in the crime although he knew his statements were not true." *Id.* During his confession, when deputies asked Thomas if he would like to be housed separately, Thomas said he would. Doc. 7-9, O.R. Vol. II at 239. A deputy asked Thomas if he was still affiliated with the Meadowbrook Bloods, and Thomas stated that he "just cut them off today. You heard them talking all of that shit to me. There was a dude a couple of cells down. One of my homies. He was talking some mess with me." *Id.* at 240. A deputy asked Thomas whether he thought "they will try to fight with you," to which Thomas responded that "[t]hey will." *Id.* The interviewer (and not Thomas) initiated the conversation about being in fear of other inmates, and, at that point, neither the interviewer nor Thomas mentioned extradition to Oklahoma.

During the interview, Thomas expressed remorse over the killing of Walton. *Id.* at 241. Although he stated he would have been happy if Doyle had been killed, *id.* at 242, Thomas stated that knowing Walton had been killed "made [him] feel fucked up. The dude in the wheelchair wasn't supposed to die." *Id.* at 241. A deputy commented "[t]hat happens a lot though," to which Thomas responded, "But nobody seen him." *Id.*

As the OCCA correctly pointed out, it is possible that Thomas' fear of his fellow inmates may have played a role in his decision to confess to the shooting. However, the jury could have considered those circumstances in deciding how much weight to afford Thomas' confession had it been admitted. In addition, the possibility that Thomas was motivated to confess because he feared his fellow inmates, as opposed to remorse over the death of Walton or a mixture of the two emotions, is not enough to move his confession into the realm of mere speculation or to sever his

15

connection to the crime itself. *Krider*, 497 F. App'x at 820. Thomas confessed spontaneously to a deputy. Doc. 7-9, O.R. Vol. II at 221; *see Green v. Georgia*, 442 U.S. 95, 97 (1979); *Chambers v. Mississippi*, 410 U.S. 284, 300 (1973). He stated, "I want to confess to a murder that happened in Tulsa Oklahoma. . . . I just want to get back to Tulsa and do my time." Doc. 7-9, O.R. Vol. II at 221. Thus, he clearly recognized that, by confessing to being the shooter, he was opening himself up to criminal liability and that his statement would be against his interests. Therefore, the circumstances surrounding Thomas' confession are not sufficient to render his confession speculative or sever its connection to the main issue in Petitioner's trial. *Krider*, 497 F. App'x at 820; *Holmes*, 547 U.S. at 330.

Second, the OCCA stated that "the co-defendant's description of the crime does not agree with the other evidence in the case" and that "[t]he new facts in Thomas' confession are not consistent with the known facts." Doc. 6-3 at 3. After reviewing the trial transcripts as well as Thomas' confession, the Court identifies two significant discrepancies between the account of the shooting given by Doyle, Walker, Gordon, and Petitioner and the confession given by Thomas. First, Thomas stated that Petitioner did not have a gun that day. Doc. 7-9, O.R. II at 229. When asked how he knew Petitioner did not have a gun, Thomas stated that he knew because "there was no extra gunshots." *Id.* at 230. Later in the interview, Thomas again asserted that he knew Petitioner did not have a gun. *Id.* at 236. Second, Thomas stated that, contrary to the testimony of Petitioner, Walker, and Goudeaux, he did not shoot out the window, but instead he "cracked [the] door open" and shot out the open door. *Id.* at 232.

While these details are discrepancies, they neither negate the substantial evidence connecting Thomas to the crime nor render Thomas' confession merely speculative. Thomas' recounting of the

16

incident as well as the circumstances that led up to the shooting tracked the testimony of Walker, Gordon, and Petitioner. It is uncontroverted that Thomas was present at the time of the shooting and was actively participating in the events by driving the vehicle around the block while Doyle was at the Glass House. Most importantly, a neutral, third party witness who presumably had no stake in the outcome, Helen Goudeaux, testified that she saw the person in the driver's seat fire the gun and that the person who fired the gun had a different skin tone than Petitioner.

Although Thomas' confession did not contain many additional, previously unknown facts that would explain other elements of the incident, he was able to provide some additional facts. Thomas stated that, even though his gun held seventeen rounds, it jammed as he was shooting, which might explain why the shooter only fired four to six rounds. *Id.* at 231. Thomas also stated that when he saw Doyle, he opened his door to be sure that Doyle saw him, *id.* at 233, which might explain why Doyle was able to identify Thomas as being in the car yet was could not identify Petitioner as the individual in the backseat of the car. *Id.* at 206.

Further, it is worth noting that the OCCA's ruling was based, in part, on a lack of corroboration. Nonetheless, Thomas' confession was admitted in his own trial wherein the jury found, beyond a reasonable doubt, that Thomas was guilty of second degree murder and assault and battery with a deadly weapon. *Thomas*, Case No. F-2012-4; *cf. Green*, 442 U.S. at 97 (finding that exclusion of testimony denied appellant a fair trial where testimony was "sufficiently reliable" to use against appellant's co-defendant and "to base a sentence of death upon it"). Therefore, the discrepancies between Thomas' confession and the witnesses' testimony at trial are not sufficient to render his confession speculative or sever its connection to the main issue in Petitioner's trial. *Krider*, 497 F. App'x at 820; *Holmes*, 547 U.S. at 330.

Third, the OCCA stated that "the co-defendant wrote several letters to the trial court recanting his confession." Doc. 6-3 at 3. While it is true that a confession that has not been recanted may carry more weight than a confession that has been recanted, the retraction of a confession does not necessarily invalidate it. *Cf. United States v. Treas-Wilson*, 3 F.3d 1406, 1408 (10th Cir. 1993) (finding that the evidence was sufficient to convict the defendant of first degree murder where there was "no eyewitness or physical evidence identif[ying] [defendant] as the killer" and the government relied on defendant's out-of-court confessions which he subsequently recanted). At the time Thomas recanted his confession, he was sitting in jail charged with first degree murder and assault and battery with a deadly weapon, and the prosecution had used his confession against him at his preliminary hearing. *See* Doc. 7-7 at 10; Doc. 7-8, O.R. Vol. I at 145, 148-50. It seems likely that, faced with the consequences of his actions, Thomas thought better of his decision to confess. Based on the record, the circumstances of Thomas' recantation do not serve to render his confession merely speculative or sever its connection to the main issue in Petitioner's trial. *Krider*, 497 F. App'x at 820; *Holmes*, 547 U.S. at 330.

Additionally, the OCCA stated that "[n]othing in the record suggests that the State's witnesses were either habitual liars or had any motive to lie in this case." Doc. 6-3 at 3-4. However, contrary to the OCCA's statement, the record contains evidence suggesting that at least one witness, Aisha Walker, had a motive to lie about Petitioner's participation in the shooting. Walker was Thomas' girlfriend. Doc. 7-3, Tr. Vol. II at 236. In addition, Gordon testified for the prosecution that Walker cut Thomas' hair to alter his appearance after the shooting. Doc. 7-4, Tr. Vol. III at 27. Gordon also testified that there was a conversation between Walker and Thomas about discarding

the gun used in the shooting and that Thomas directed Walker to dispose of the gun.[8]  *Id.*  Thomas stated in his confession that he "gave [the gun] to somebody. . . . [t]o get rid of."  Doc. 7-9, Tr. Vol. VIII at 232.

While the trial court could legitimately keep the jury from hearing evidence that presented an undue risk of confusion or was speculative or only marginally relevant, the trial court could not, without violating the Constitution, keep the jury from hearing reliable evidence that was favorable to the defendant and that spoke to the central issue in the case.  The trial judge's decision to prevent the defense from introducing Thomas' confession into evidence did not protect the jury from the difficulties associated with navigating a third party perpetrator defense.  Petitioner testified that it was Thomas who fired the weapon, and even more importantly, the defense was allowed to introduce the testimony of a presumably neutral witness who testified that it was the driver who fired the weapon.  Thomas' confession would not have introduced the issue of a third party perpetrator to the jury; it would have bolstered Petitioner's claim that he was not the shooter.

Based on the foregoing analysis, the Court finds that the OCCA's adjudication of Petitioner's claim challenging the exclusion of Thomas' confession was an unreasonable application of clearly established federal law, as determined by the Supreme Court.  *See* 28 U.S.C. § 2254(d)(1).  As a result, the OCCA's analysis is not entitled to deference on habeas corpus review and the Court will review Petitioner's claim *de novo*.  *See Williams v. Trammell*, 539 F. App'x 844, 852 (10th Cir. 2013) (unpublished).

---

[8] Petitioner also testified that Walker cut Thomas' hair and that Thomas directed Walker to discard the gun.  Doc. 7-5, Tr. Vol. IV at 13, 22.

Even if the trial judge's ruling resulted in a violation of Petitioner's Sixth Amendment right to present a complete defense, the error is subject to a harmless error analysis. *See Jones v. Stinson*, 229 F.3d 112, 120 (2nd Cir. 2000); *Forensic v. Birkett*, 501 F.3d 469, 480-484 (6th Cir. 2007); *DePetris v. Kuykendall*, 239 F.3d 1057, 1061 (9th Cir. 2001). The appropriate harmless error standard to be applied on habeas review was presented in *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007); *Herrera v. Lemaster*, 301 F.3d 1192, 1199 (10th Cir. 2002).

The *Brecht* standard "requires reversal only if [the error] had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 631 (internal quotation marks and citation omitted). "[A] substantial and injurious effect exists when the court finds itself in grave doubt about the effect of the error on the jury's verdict. Grave doubt exists where the issue of harmlessness is so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error." *Bland v. Sirmons*, 459 F.3d 999, 1009-10 (10th Cir. 2006) (internal quotation marks and citations omitted).

In determining whether an error was harmless in this context, the Court considers factors such as the "importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." *Littlejohn v. Trammell*, 704 F.3d 817, 846 (10th Cir. 2013) (citations omitted); *see Jones v. Gibson*, 206 F.3d 946, 957 (10th Cir. 2000); *Wiggins v. Boyette*, 635 F.3d 116, 121-22 (4th Cir. 2011). "[E]rrors which do not contribute to the verdict

20

should not be reversed unless their effect is fundamentally unfair." *United States v. Turrietta*, 696

F.3d 972, 984 (10th Cir. 2012) (citation omitted).

During closing arguments, the prosecution contended that, if the jury determined that

Petitioner had not fired the shots that wounded Doyle and killed Walton, the jury should still find

Petitioner guilty as a principal because he had aided and abetted the shooter. The prosecution

argued that:

> [Petitioner is] a principal to this offense because of his actions. He's not just
> an innocent bystander. He's not somebody who just didn't know what was going on.
> He acted. He acted when he brought the gun. He acted when he pointed out Mr.
> Doyle to Mr. Thomas. He acted when he tried to get out of the car.
>     He acted when they turned around the corner, he pulled out his gun. He acted
> when he told Erica Gordon "watch out" and pulled her toward him and hid her face.
> He acted when he reached across her with the gun. Ladies and gentlemen, each one
> of those is an act. He is a principal to this crime.

Doc. 7-5, Tr. Vol. at IV at 87. The prosecution also argued that, if the jury credited Petitioner's

testimony that Thomas lowered the front driver's side window, Petitioner would have known

Thomas was going to shoot at Doyle after seeing Thomas pull down the window. *Id.* at 113.

Under Oklahoma law, an individual who aids and abets a crime is considered a principal and

is "equally culpable with other principles [sic]." *Conover v. State*, 933 P.2d 904, 910 (Okla. Crim.

App. 1997) (citations omitted); *see* OKLA. STAT. tit. 21, § 172 (stating that persons "concerned in

the commission of crime, . . . whether they directly commit the act constituting the offense, or aid

and abet in its commission, though not present, are principals."). "Aiding and abetting in the crime

requires the State to show the accused procured it to be done, or aids, assists, abets, advises or

encourages the commission of the crime. Mere presence or acquiescence, without participation,

does not constitute a crime." *Hindman v. State*, 647 P.2d 456, 457 (Okla. Crim. App. 1982) (citation

omitted). "Proof that [a] defendant aided and abetted the principals in the commission of the crime

can be proven by circumstantial evidence, and if sufficient, . . . will support the verdict." *Battles v.*

*State*, 459 P.2d 623, 628 (Okla. Crim. App. 1969).  Pursuant to Oklahoma law, Petitioner's jury

received the following instructions on aiding and abetting:

> All persons concerned in the commission of a crime are regarded by the law
> as principals and are equally guilty thereof.  A person concerned in the commission
> of a crime as a principal is one who directly and actively commits the act(s)
> constituting the offense, or knowingly and with criminal intent aids and abets in the
> commission of the offense.
> . . . .
> One who does not actively commit the offense, but who aids, promotes, or
> encourages the commission of a crime by another person, either by act or counsel
> or both, is deemed to be a principal to the crime if he knowingly did what he did
> either with criminal intent or with knowledge of the other person's intent.  To aid
> or abet another in the commission of a crime implies a consciousness of guilt in
> instigating, encouraging, promoting, or aiding in the commission of that criminal
> offense.

Doc. 7-9, O.R. Vol. II at 279-80.

Based on the evidence presented by the prosecution, the Court finds that the trial judge's

exclusion of Thomas' confession did not have a substantial and injurious effect on the verdict and

was, therefore, harmless error.  As a preliminary matter, in light of Petitioner's counsel's statement

that "because we've been denied the opportunity to present Mr. [Thomas'] confession into the record

and to the jury, [Petitioner] feels compelled that he must testify," the Court questions whether

Petitioner would have testified at trial had Thomas' confession been admitted.  *See Sharp v. Rohling*,

793 F.3d 1216, 1239 (10th Cir. 2015).  If Petitioner had not testified, the jury would not have heard

Petitioner confirm that he thought Doyle had tried to rob him a month before and that he pulled a

loaded gun before the shooting.  Doc. 7-5, Tr. Vol. IV at 11-13, 15, 16.  The jury would not have

heard Petitioner state that when they left the Glass House he "thought that we [were] just [going to]

circle the block and come back and, you know, show 'em, like, hey, we got guns, you know, but I

never intended to shoot anybody you know." *Id.* at 13.  The jury also would not have heard Thomas

assert that he did not know Thomas intended to shoot his gun and that, while he said "God, forgive

me" when he learned that a bystander had been killed, he never stated "I thought I was a better aim."

*Id.* at 13, 24.

Nonetheless, the prosecution presented substantial evidence demonstrating that, even if

Petitioner was not the shooter, he was guilty of aiding and abetting Thomas in the shooting.  Doyle

testified that Petitioner had previously told him that "he was coming after [him]."  Doc. 7-3, Tr. Vol.

II at 186.  Aisha Walker confirmed that Petitioner recognized Doyle at the Glass House, and

Petitioner told Thomas, "[t]here's that dude we got into it with."  *Id.* at 220.  According to Walker,

Petitioner and Thomas did not "sound happy."  *Id.* at 221.  Walker stated that they stayed in the

parking lot for one or two minutes before leaving the Glass House to drive around the block, *id.*,

although her testimony is ambiguous as to whether or not Petitioner directed Thomas to drive around

the block.  *See id.* at 220-21.  Walker stated that there was no conversation "about where [they] were

going when [they] left the Glass House."  *Id.* at 222.

Erica Gordon testified that upon seeing Doyle, Thomas and Petitioner "started having a

conversation."  Doc. 7-4, Tr. Vol. III at 7.  Gordon asserted that the conversation was not "lengthy"

and the amount of time they were in the parking lot was less than five minutes.  *Id.* at 22.  Gordon

stated that Petitioner said "[s]omething about . . . they had problems or something and he wanted

to get out and talk to them," but Thomas responded that "[h]e wasn't letting him out of the car.  He

told him to hang on."  *Id.* at 7.  Gordon also stated that the only time Petitioner directed anyone's

attention to Doyle was the initial time when they were parked in front of the Glass House.  *Id.* at 26.

23

Gordon asserted that, as they went around the block, "[Petitioner] kept on asking [Thomas] just let me get out so I can talk to him. I don't know if he [was] trying to fight him or what, but he wanted to get out of the car and [Thomas] still wouldn't let him out of the car." *Id.* at 8. Gordon testified that as they drove near the gas station Petitioner "told me to watch out and he pulled my head to his arm." *Id.* at 9. She stated that she then saw him pull a gun out from the right side of the car. *Id.*

The Court finds that the prosecution's evidence was sufficient for the jury to find that Petitioner was aware of what was about to transpire as they came upon the gas station and that, even if Petitioner was not the shooter, he aided and abetted Thomas in the shooting by pulling his own gun before Thomas shot at Doyle. Therefore, Petitioner could be found guilty as a principal. For that reason, the Court cannot find that the alleged error in excluding Thomas' confession as evidence the error had a substantial or injurious effect or influence in determining the jury's verdict and the error was harmless under *Brecht*. Petitioner is not entitled to habeas corpus relief on Ground 1.

### 2. Comments on Petitioner's right to remain silent (Ground 2)

As his second proposition of error, Petitioner alleges that the "State improperly [commented] on Petitioner's right to remain silent in violation of his rights under [the] Fifth Amendment." Doc. 1 at 7. During cross-examination of Petitioner, the prosecutor stated, "this is really the first time you've told this story before, isn't it?" Doc. 7-5, Tr. Vol. IV at 14. During closing arguments, the prosecutor stated that the jury "can't judge [Petitioner's] consistency because this is the first time that he's told what happened," *id.* at 97, and during her rebuttal closing, the prosecutor stated that "today is the first day the defendant has ever told anyone what happened." *Id.* at 115. Petitioner's

trial counsel did not object to these statements.  Doc. 6-3 at 4.  Therefore, the OCCA reviewed the claim under a plain error standard.  *Id.*

> In reviewing this claim, the OCCA held that:

> [A]ny reference to Adetula's right to remain silent was harmless beyond a reasonable doubt. . . . Adetula did not object to the prosecutor's comments.  Two witnesses in the vehicle with Adetula identified him as the shooter.  Adetula admitted having a gun and drawing it immediately before the shots were fired.  Adetula had a motive to shoot the intended victim.  The record supports a conclusion, beyond a reasonable doubt, that the jury did not reach its verdict based on the improper comments.

Doc. 6-3 at 4-5 (citations omitted).  Respondent argues that the OCCA's determination was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  Doc. 6 at 25-26; *see* 28 U.S.C. § 2254(d)(1).

The privilege against self-incrimination, found in the Fifth Amendment, includes the right to pre-trial silence.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  A prosecutor may not refer to a defendant's exercise of his Fifth Amendment rights.  *Doyle v. Ohio*, 426 U.S. 610, 619 (1976).  Oklahoma defines plain error as "an error which goes to the foundation of the case, or which takes from a defendant a right essential to his defense," *Simpson v. State*, 876 P.2d 690, 698 (Okla. Crim. App. 1994), and "impinges on the fundamental fairness of trial."  *Cleary v. State*, 942 P.2d 736, 753 (Okla. Crim. App. 1997).  Addressing Oklahoma's definition of plain error, the Tenth Circuit found that there was "no practical distinction between the formulations of plain error . . . and the federal due-process test, which requires reversal when error 'so infused the trial with unfairness as to deny due process of law.'"  *Thornburg v. Mullin*, 422 F.3d 1113, 1125 (10th Cir. 2005) (citation omitted).  Therefore, when the OCCA applies the plain error standard of review, this Court must defer to its ruling unless it 'unreasonably appli[ed]' the test.  *Thornburg*, 422 F.3d at 1125 (citing 28 U.S.C. §

25

2254(d)).  Violations of a defendant's right to remain silent are subject to harmless error review using

the "substantial injurious effect" test found in *Brecht*, 507 U.S. at 638.  *Bland*, 459 F.3d at 1023.

The prosecution presented testimony from one witness inside the vehicle which, if credited

by the jury, would establish that Petitioner was the shooter, Doc. 7-3, Tr. Vol. II at 223, as well as

testimony from a second witness inside the vehicle confirming that Petitioner had a gun in the vehicle

and pulled the gun out immediately before the shooting began.  Doc. 7-4, Tr. Vol. III at 9;  Doc. 7-5,

Tr. Vol. IV at 12-13.  The record contains no additional facts suggesting that the jury's verdict was

based on the prosecutor's statement and not on the strength of the other evidence presented by the

prosecution.  Therefore, after reviewing the record, the Court cannot find that the prosecutor's

comments had a substantial and injurious effect in determining the jury's verdict.  Petitioner is

entitled to habeas corpus relief on Ground 2.

### 3.  Prosecutor's misstatements of fact and law (Ground 3)

As his third proposition of error, Petitioner alleges that the "[p]rosecutor misstated facts and

law during closing arguments."  Doc. 1 at 8.  During closing arguments, the prosecutor stated that

"Erica said that night while they were watching TV she heard the defendant say 'I thought I was a

better aim. God, forgive me.'"  Doc. 7-5, Tr. Vol. IV at 94.  Petitioner asserts that this statement was

not supported by Gordon's testimony at his trial.  Doc. 2 at 3.  Petitioner also alleges that the

prosecutor's argument that the jury could find that Petitioner aided and abetted Thomas contained

"gross distortions of the law on principals and misled the jury."  *Id.* at 4.  Petitioner's trial counsel

failed to object to these comments.  Doc. 6-3 at 5.  The OCCA, reviewing for plain error, found that:

> [T]he prosecutor's misstatement of fact in argument does not require relief.  Adetula
> did not object to the incorrect statement in closing argument, and we review for plain
> error.  There is none.  Both parties have wide latitude to argue facts and inferences
> from the evidence, and we will not grant relief unless a defendant is so prejudiced by

the argument as to be denied a fair trial.  We review claims of improper argument within the context of the entire trial.  Given the strength of the State's case, we cannot conclude that the jury's verdict was improperly swayed by the misstatement of fact. The record does not support a conclusion that this misstatement either probably resulted in a miscarriage of justice, or constituted a substantial violation of a constitutional or statutory right.

Doc. 6-3 at 5 (citations omitted).  Although the OCCA did not specifically address Petitioner's claim

that the prosecutor's characterization of the law was incorrect,  the OCCA denied relief on all claims.

Nothing in 28 U.S.C. § 2254(d)(1) "require[es] a statement of reasons" by the state court, *Richter*,

562 U.S. at 98, and habeas courts can "determin[e] whether a state court's decision resulted from an

unreasonable legal or factual conclusion . . . [without] an opinion from the state court explaining the

state court's reasoning." *Id.*  Respondent argues that the OCCA's determination was not contrary to,

or an unreasonable application of, clearly established federal law, as determined by the Supreme

Court, and Petitioner is not entitled to habeas relief.  Doc. 6 at 29, 30; *see* 28 U.S.C. § 2254(d)(1).


Habeas corpus relief is available for prosecutorial misconduct only when the prosecution's

conduct is so egregious in the context of the entire trial that it renders the trial fundamentally unfair.

*Donnelly v. DeChristoforo*, 416 U.S. 637, 642-45 (1974); *Cummings v. Evans*, 161 F.3d 610, 618

(10th Cir. 1998).  Inquiry into the fundamental fairness of a trial requires examination of the entire

proceedings. *Donnelly*, 416 U.S. at 643.  "To view the prosecutor's statements in context, we look

first at the strength of the evidence against the defendant and decide whether the prosecutor's

statements plausibly could have tipped the scales in favor of the prosecution." *Fero v. Kerby*, 39 F.3d

1462, 1474 (10th Cir. 1994) (internal quotation marks omitted); *see Smallwood*, 191 F.3d at 1275-76.

Additionally, because the OCCA applied the plain error standard of review, this Court must defer to

its ruling unless it 'unreasonably appli[ed]' the test. *Thornburg*, 422 F.3d at 1125 (citing 28 U.S.C. § 2254(d)).

Although the prosecutor's statement that "Erica said that night while they were watching TV she heard the defendant say 'I thought I was a better aim'" is not supported by the record, the jury's verdict is supported by the other evidence presented by the prosecution. Specifically, the prosecution presented witness testimony that supported the prosecution's theory that Petitioner was armed, pulled his gun before the shooting, and fired at Doyle.

Petitioner also argues that "the Prosecutor [] misled the jury to believe it could properly find Petitioner guilty as a principal to the homicide because he may have witnessed acts of Mr. Thomas or that he had a gun." Doc. 2 at 4 (citation omitted). Petitioner's argument was properly rejected by the OCCA. During closing arguments, the prosecutor correctly stated that "[i]f you stand there even knowing somebody else is going to do it, you're not responsible. Mere presence at the scene isn't enough." Doc. 7-5, Tr. Vol. IV at 86. The jury was also correctly instructed that "[m]erely standing by, even if standing by with knowledge concerning the commission of a crime, does not make a person a principal to a crime. Mere presence at the scene of a crime, without participation, does not make a person a principal to a crime." Doc. 7-9, O.R. Vol. II at 280.

Therefore, after reviewing the record, the Court cannot find that the OCCA's determination that the prosecutor's comments did not render the trial fundamentally unfair is contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Petitioner is not entitled to habeas corpus relief on Ground 3.

### 4.  Ineffective assistance of counsel (Ground 4)

In his fourth proposition of error, Petitioner claims that he received ineffective assistance of counsel.  Doc. 1 at 10.  According to Petitioner, his attorneys at trial were ineffective because they failed to "object[] to the [prosecutor's] misstatement[s] of facts and law."  Doc. 2 at 5.  Petitioner states that because his attorneys failed to object to the misstatements he was "barred from addressing [those issues] on Direct Review."  *Id.*  Petitioner also claims that counsel was ineffective for failing to "properly and timely subpoena[] Deputy Hart and Sgt. McBeth-Childs from California."  *Id.*

Addressing this issue on direct appeal, the OCCA stated:

> Adetula raises two properly preserved claims.  He first argues that counsel was ineffective for failing to object to the prosecutor's comments on his right to remain silent, discussed in Proposition II, and misstatements of fact in argument, discussed in Proposition III.  We found in Proposition II that the prosecutor's statements were harmless beyond a reasonable doubt.  We found in Proposition III that Adetula was not prejudiced by the misstatement in argument.  Adetula also claims that trial counsel was ineffective for failing to ensure that a California officer was present to sponsor the co-defendant's confession.  The record does not support Adetula's claim that counsel's failure to subpoena California officers had any effect on the trial court's decision not to admit the document.  In ruling that the confession was inadmissible hearsay, the trial court explicitly stated that chain of custody – whether a California officer could sponsor the document – was not a factor in its rulings.  As counsel's omissions had no effect on the outcome of the trial, Adetula cannot show he was prejudiced.

Doc. 6-3 at 6-7.

To be entitled to habeas corpus relief on his claim of ineffective assistance of trial counsel, Petitioner must demonstrate that the OCCA's adjudication of his claim was contrary to, or an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984).  *See* 28 U.S.C. § 2254(d).  *Strickland* sets out a two-pronged standard for review of ineffective assistance of counsel claims.  A defendant must show that (1) his counsel's performance was deficient and (2) the deficient performance was prejudicial.  *Id.* at 687.

The first prong may be established by showing that counsel performed below the level expected from a reasonably competent attorney in criminal cases. *Id.* at 687-88.  There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689 (citation omitted).  In making this determination, a court must "judge . . . [a] counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.  Moreover, review of counsel's performance must be highly deferential.  "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689 (citation omitted).

To establish the second prong, a defendant must show that this deficient performance prejudiced the defense, to the extent "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see Sallahdin v. Gibson*, 275 F.3d 1211, 1235 (10th Cir. 2002); *Boyd*, 179 F.3d at 914; *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011) (stating that a petitioner must show that counsel's errors rendered the results of the trial unreliable).  "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.  Review of a state court's decision on ineffective assistance of counsel claims is "doubly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (noting that a habeas court must "take a highly deferential look at counsel's performance" under *Strickland* and "through the deferential lens of § 2254(d)" (internal quotation marks omitted)).

Petitioner argues in his habeas petition that his attorneys were ineffective because they failed to object to the prosecutor's "misstatement of fact and law" during closing arguments.  Doc. 2 at 5. Petitioner claims that because his attorneys failed to object at trial he was "barred from addressing

30

[these issues] on Direct Review." *Id.* Petitioner also argued on direct appeal that his attorneys were ineffective because they failed to object to the prosecutor's comments on Petitioner's right to remain silent.[9] Doc. 6-1 at 26.

In reviewing Petitioner's claim of ineffective assistance of counsel on direct appeal, the OCCA found that Petitioner was not prejudiced by either counsel's failure to object to the prosecutor's comments on Petitioner's right to remain silent or counsel's failure to object to the prosecutor's misstatement of fact. Doc. 6-3 at 6; *see id.* at 4-5. The Court agrees and finds, for the reasons discussed above in Sections B(2) and B(3), that Petitioner cannot show prejudice and cannot satisfy the *Strickland* standard for ineffective assistance of counsel.

The OCCA also found that the failure of trial counsel to subpoena California officers to sponsor Thomas' confession did not prejudice the defense. The trial judge specifically stated that his decision as to whether he would admit Thomas' confession was based on the credibility of the corroboration, not on whether the chain of custody could be established. Doc. 7-3, Tr. Vol. II at 172. In ruling on the state's motion in limine, the judge did not refer to the issue of the chain of custody. Doc. 7-4, Tr. Vol. III at 143. Because trial counsel's failure to subpoena California's officers was not a factor in the trial judge's ruling, Petitioner cannot demonstrate prejudice.

Therefore, after reviewing the record, the Court cannot find that the OCCA's determination that Petitioner did not receive ineffective assistance of counsel is contrary to, or an unreasonable application of, as determined by the Supreme Court. Petitioner is not entitled to habeas corpus relief on Ground 4.

---

[9] To the extent that Petitioner incorporates this argument into his habeas petition, the Court addresses it as well.

C.      **Certificate of appealability**

Rule 11, *Rules Governing Section 2254 Cases in the United States District Courts*, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."   Pursuant to 28 U.S.C. § 2253, the court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicate[s] which specific issue or issues satisfy [that] showing."   A petitioner can satisfy that standard by demonstrating that the issues raised are debatable among jurists, that a court could resolve the issues differently, or that the questions deserve further proceedings.   *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (citation omitted).

After considering the record in this case, the Court concludes that a certificate of appealability should not issue.   Nothing suggests that the Tenth Circuit would find that this Court's application of AEDPA standards to the decision by the OCCA was debatable amongst jurists of reason.   *See Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004).   The record is devoid of any authority suggesting that the Tenth Circuit Court of Appeals would resolve the issues in this case differently. A certificate of appealability shall be denied.

## *CONCLUSION*

After a thorough review of the record, the Court concludes that Petitioner has not established that he is in custody in violation of the Constitution or laws of the United States.   Therefore, the petition for writ of habeas corpus shall be denied.

**ACCORDINGLY, IT IS HEREBY ORDERED** that,

1.    The Clerk of Court shall note on the record the substitution of Maurice Warrior, Acting

      Warden, in place of Anita Trammell, Warden, as party respondent.

2.    The petition for writ of habeas corpus (Doc. 1) is **denied.**

3.    A certificate of appealability is **denied.**

4.    A separate judgment shall be entered in this matter.

      ORDERED THIS 28th day of December, 2015.

                                    JOHN E. DOWDELL
                                    UNITED STATES DISTRICT JUDGE